# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

---

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                     Cr. No. 00-1067 JP

**MAMADOU DOUMBIA,**
**BOURAHIMA SORO, and**
**ABASS MAMADI-CAMARA,**

    **Defendants.**

## MEMORANDUM OPINION AND ORDER

On September 21, 2001, Defendants Mamadou Doumbia and Abass Mamadi-Camara filed a Motion to Suppress (Doc. No. 16), in which their co-Defendant Bourahima Soro later joined. This Court held an evidentiary hearing on the Defendants' motion on December 11 and 12, 2001 and January 10, 11, and 14, 2002. The parties have submitted a number of pre-hearing and post-hearing briefs addressing the legal issues raised by the Defendants' motion. Having carefully considered the evidence presented at the hearing, the parties' arguments, and the relevant law, the Court finds that the Defendants' motion should be denied as to the physical evidence they seek to suppress.

I.  BACKGROUND

The superseding indictment (Doc. No. 69), filed March 6, 2002, charges the Defendants with engaging in a scheme to use forged passports and Immigration and Naturalization Service I-

94 forms to apply for and obtain a number of Social Security cards.[1] The investigation that resulted in the Defendants' arrest began on July 20, 2001, when FBI Special Agent Brian Midkiff received a call from Penny Oley. Ms. Oley, the manager of the Silver Saddle Motel in Santa Fé, New Mexico, reported what she perceived to be suspicious activity at the motel. About two weeks earlier, while a Silver Saddle employee named Sally Jaffa was on duty, two or three African men rented a room at the motel. An hour after they had checked in, the men returned to the front desk. They informed Ms. Jaffa that they did not wish to stay at the motel, but that they expected to receive mail at the motel's address a couple of weeks later.

On July 20, 2001, the Defendants, who are all immigrants from the Ivory Coast, went to the Silver Saddle Motel while Ms. Oley was working.[2] They asked whether any mail had arrived in the names of Ali Hussain and Shakeel Aftaben. Although the motel had in fact received some mail addressed to Hussain and Aftaben, Ms. Oley suggested that the men contact her later in the day to check if any mail had come. At some point later on July 20, during a telephone call, Ms. Oley arranged with the Defendants to have them return to the motel at about ten o'clock the next morning, July 21, to pick up the mail. Ms. Oley had noted that the envelopes addressed to Hussain and Aftaban had been sent from the Social Security Administration. The Defendants' conduct had raised Ms. Oley's suspicions, and on the afternoon of July 20, she called the FBI's Santa Fé office. She told Agent Midkiff about what had happened two weeks earlier and about

---

[1] The original indictment (Doc. No. 8) was filed August 14, 2001.

[2] The parties have stipulated that there is no evidence identifying the Defendants as the same men who had visited the motel about two weeks earlier. The parties have been unable to locate any receipts or registration information which would reveal the names that the men who had visited the motel earlier in the month gave to Sally Jaffa, the desk clerk at that time.

2

her interactions with the Defendants on July 20.

Upon receiving Ms. Oley's report about the Defendants' visit to the Silver Saddle Motel, Agent Midkiff began to investigate. Ms. Oley had written down the license plate number of the white Toyota Camry that the Defendants were driving and had given it to Agent Midkiff, who learned that the car had been rented in Arizona on July 10 by a man named Mamadou Doumbia. Agent Midkiff also consulted Agent Joe Ontiveros of the Office of the Inspector General of the Social Security Administration. Agent Ontiveros told Agent Midkiff that federal authorities in Oklahoma were investigating a group of African men with foreign accents who were allegedly traveling around the Southwest and fraudulently obtaining Social Security cards.

Agent Midkiff and another FBI Agent, Matthew McCullough, went to the Silver Saddle Motel on the morning of July 21, 2001, before the Defendants were due to arrive. Watching the Silver Saddle Motel from their cars, the agents saw a white Toyota Camry pull up to the motel at about 11:15 a.m. Three black men were riding inside the Camry. At least one of the men got out of the car, went inside the motel, and returned to the car soon after. Next, two of the car's occupants opened the trunk, retrieved something, and then entered the Silver Saddle Motel. Several minutes later, the men came out of the motel, got back into the Camry, and drove away. Agent Midkiff called Ms. Oley from his car to ask what had happened while the men were at the motel. Ms. Oley reported that she had told the men that they needed to present identification before she would turn over the mail. The men showed her passports from the Caribbean nation of Trinidad and Tobago, in the names of Ali Hussain and Shakeel Aftaben, and Ms. Oley gave the men the mail.

Agent Midkiff and Agent McCullough followed the Defendants as the Camry drove away

from the Silver Saddle.  The Defendants left Santa Fé and began traveling south on Interstate 25, toward Albuquerque.  Agent McCullough contacted the New Mexico State Police Department and spoke with Officer Ernest Garcia, who was on patrol nearby.  Agent McCullough explained that the men in the Camry had picked up mail in the names of Hussain and Aftaben, and he asked Officer Garcia to stop the Camry and verify the identities of the people in the car.

Officer Garcia spotted the Camry on I-25, near La Bajada, and observed that one of the passengers, Mr. Mamadi-Camara, was not wearing a seatbelt.  Officer Garcia pulled the Camry over, approached the car, and asked that all of the occupants produce identification.  The car's driver presented a New York driver's license in the name of Mamadou Doumbia, the front-seat passenger presented an Arizona ID card in the name of Mohamed Ali, and the back-seat passenger presented an Arizona ID card in the name of Abass Camara Mamadi.  Officer Garcia went to his patrol car, then returned and asked the men whether they had any passports in the car.  Mr. Doumbia opened the trunk and retrieved an Ivory Coast passport in the name of Souleymane Cisse.  According to Mr. Doumbia, he explained to Officer Garcia that the passport was not his.  However, none of the Defendants produced either of the two Trinidad and Tobago passports that two of the Camry's occupants had shown to Ms. Oley only a short time earlier, in order to get her to release the Social Security letters.

Officer Garcia went back to his patrol car and contacted Agent McCullough.  After conferring with Agent Midkiff, Agent McCullough told Officer Garcia to release the Defendants, so that the agents could follow them and observe their next step.  Officer Garcia returned to the Camry, issued Mr. Mamadi-Camara a citation for failing to wear a seatbelt, and allowed the Defendants to continue on their way.  The Defendants traveled south on I-25 and exited at

Central Avenue, in Albuquerque.

Once in Albuquerque, the Defendants first drove east on Central, to the Starbuck's coffee shop at the intersection of Central and Tulane, where one of the Defendants apparently got out of the car to buy a cup of coffee. The Defendants then drove west on Central for several miles, to the west side of Albuquerque. They made a U-turn at an intersection, pulled into the parking lot of a convenience store, and got out of the Camry. Mr. Doumbia began speaking on a cell phone. The agents observed that while he spoke, Mr. Doumbia walked to the edge of the parking lot and looked up and down the street a couple of times.

After they returned to their car, the Defendants drove to a McDonald's fast-food restaurant located on the north side of Central, diagonally across the street from the convenience store. At this time, Agent McCullough and Agent Midkiff decided to approach the Defendants in the McDonald's parking lot. The Defendants and the agents have offered very different versions of what took place during the encounter in the parking lot. It is not necessary to make factual determinations regarding the actual events and circumstances of the encounter because, as the Court will discuss below, probable cause to arrest the Defendants existed prior to the parking lot detention.

During the course of the encounter at the McDonald's parking lot, the agents searched the passenger compartment and trunk of the Camry, as well as the contents of the Defendants' suitcases in the trunk. Inside the Camry, Agent McCullough found items including a map printed out from the Internet that showed the locations of Social Security offices, and several blank I-94 immigration forms. Post-it notes, listing names and dates of birth, were attached to the backs of the forms. When Agent McCullough opened the trunk, he saw some mailing supplies, such as

envelopes, both inside a clear blue plastic bag and out in the open within the trunk. In Mr. Doumbia's duffel bag, Agent McCullough found a number of letters from the Social Security Administration, concerning applications for Social Security cards and benefits, all addressed to different names. Mr. Soro's bag contained identification documents, including three passports. Mr. Mamadi-Camara's bag held letters from the Social Security Administration, Social Security applications, and some I-94 forms. The Defendants contend that the search through which the agents found these items was illegal, and that the evidence should therefore be suppressed.

II. THE STOP ON INTERSTATE 25

The Defendants challenge the legality of Officer Garcia's conduct during the stop on I-25. The Tenth Circuit has observed that "[s]topping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). Because "[a]n ordinary traffic stop is . . . more analogous to an investigative detention than a custodial arrest," the Tenth Circuit examines "such stops under the principles pertaining to investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), citing *United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995); *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991).

The Tenth Circuit has noted that when applying *Terry* principles "[t]o determine whether an investigative detention . . . is reasonable under the Fourth Amendment, the inquiry is twofold." *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993). First, the court must ask whether the officer's conduct was "'justified at its inception.'" *Id.*, quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Second, the court must examine "whether the officer's action is 'reasonably related in

6

scope to the circumstances which justified the interference in the first place.'" *Id.*, quoting *Terry*, 392 U.S. at 20.

In this case, the Defendants do not appear to contest that their encounter with Officer Garcia on I-25 was "justified at its inception." Officer Garcia observed that Defendant Mamadi-Camara was violating New Mexico law by failing to wear a seatbelt. Although Agent McCullough's request for assistance with verifying the identities of the men in the Camry may have prompted Officer Garcia's actions, this fact does not undermine the validity of the stop. The Tenth Circuit has made clear that "[i]t is irrelevant, for purposes of Fourth Amendment review . . . that the officer may have had other subjective motives for stopping the vehicle." *Botero-Ospina*, 71 F.3d at 787. See also *Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted to the contrary.") A court's "sole inquiry" should be "whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Botero-Ospina*, 71 F.3d at 787, quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979).

The Defendants maintain that Officer Garcia exceeded the proper scope of his investigation of Mr. Mamadi-Camara's seatbelt violation. The Tenth Circuit "has stated that an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation." *Zubia-Melendez*, 263 F.3d at 1161. However, if the driver "has produced 'a valid license and proof that he is entitled to operate the car,'" he "'must be allowed to proceed on his way'" once "the officer

7

has issued the citation." Id. According to the Defendants, Officer Garcia overstepped the boundaries of a legitimate traffic stop by 1) requesting to see identification from Mr. Soro, who was neither the driver of the car nor the person observed violating the seatbelt law, and 2) after having examined Mr. Doumbia's license and rental car agreement, asking the Defendants whether they had any passports in the car.

The Government emphasizes that an officer need not allow a stopped car to proceed on its way if reasonable suspicion of an offense other than the traffic violation develops during the course of the detention. In *Zubia-Melendez*, the Tenth Circuit made clear that even after the officer has inspected the driver's license and registration, the officer "may nevertheless detain a suspect for further questioning if the officer has an 'objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring' or if the suspect consents to additional questions." Id.

In order to evaluate the lawfulness of Officer Garcia's detention of the Defendants on I-25, this Court must identify the point at which reasonable suspicion developed. The Court finds that Officer Garcia had reasonable suspicion that the Defendants were engaging in illegal conduct once he had checked the Defendants' identifications during the traffic stop. "When discussing how reviewing courts should make reasonable-suspicion determinations," the United States Supreme Court has "said repeatedly that they must look at the 'totality of circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 122 S.Ct. 744, 750 (2002). The Supreme Court has recently stressed that all of the factors potentially contributing to reasonable suspicion should be considered together, instead of separately. Id. at 751.

In this case, it is a close question whether the information known to law enforcement *prior* to the I-25 stop amounted to reasonable suspicion. The following factors indicated that the Defendants were taking part in unusual, suspicious activity:

1) The men who initially arranged to receive mail at the Silver Saddle Motel, about two weeks before July 20, 2001, had behaved in a peculiar manner. Only an hour after checking in, they informed the desk clerk that they intended to leave without staying at the motel, but that they wished to receive mail at the motel's address.

2) At least one of the letters that the Defendants collected at the motel bore a return address from the Social Security Administration. Common sense suggests that individuals would ordinarily have correspondence from a government agency directed to an address with which they have some substantial connection. Here, neither the Defendants nor the persons for whom they may have been picking up the mail had ever even stayed overnight at the motel.

3) Although the Defendants may dispute whether they were the men who had visited the Silver Saddle Motel two weeks before July 20, 2001, and they may also deny that they represented to the Silver Saddle manager that they were the people to whom the mail was addressed, by the Defendants' own account, they at least identified themselves as friends or acquaintances of the addressees and stated that they were acting on behalf of the addressees. Thus, at minimum, the law enforcement agents had grounds to believe that the Defendants were linked to the unusual activity at the Silver Saddle two weeks before.

4) Agent Midkiff had learned from Agent Ontiveros of the Office of Inspector of Social Security of an investigation into Social Security fraud that was taking place in Oklahoma. That investigation targeted a group of black men with foreign accents who were traveling through the

Southwest obtaining false Social Security cards. This lead was not specific as to a description of the suspects or their modus operandi, but the Oklahoma information corresponded with the information that the agents had gathered about the Defendants, in several respects. The Defendants had picked up a letter from the Social Security Administration, the Defendants appeared to be traveling given their use of a rental car and motels, the Defendants' rental of the car and their travels were in the Southwest, and the Defendants were black men with foreign accents.

Even considered together, the factors just discussed barely amounted to grounds for reasonable suspicion. However, against the backdrop of these factors, the Defendants' conduct at the beginning of the traffic stop on I-25 unquestionably created reasonable suspicion. When Officer Garcia asked the Defendants for identification, and two of the Defendants provided different identifications than they had shown at the Silver Saddle Motel less than an hour before, the officer acquired "a 'particularized and objective basis' for suspecting legal wrongdoing." The Defendants' use of different identities suggested that they may have participated in some criminal activity, whether that activity was showing false identification during the traffic stop, picking up someone else's mail without permission, or applying for Social Security cards under phony names. In the context of the reasonable suspicion required to support investigatory detentions, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id.

The Court's finding that reasonable suspicion indisputably had developed once the Defendants showed their identifications during the I-25 stop addresses one of the Defendants' grounds for arguing that Officer Garcia exceeded the proper bounds of the detention. Given that

Officer Garcia had reason to believe that the Defendants were participating in criminal activity involving the use of false identities, he had a valid basis for investigating whether the Defendants had additional pieces of identification in their possession. Therefore, Officer Garcia's request to see any passports that the Defendants had in the car can be characterized not as an improper question during a seatbelt-violation investigation, but rather as a proper question prompted by the indications that the Defendants might be engaging in identity fraud.

The Court's determination that reasonable suspicion had developed during the I-25 stop does not address the Defendants' other ground for arguing that Officer Garcia's conduct during the I-25 stop was unlawful. The Defendants point out that at the outset of the detention, Officer Garcia asked to see identification not just from Mr. Doumbia, who was driving, and Mr. Mamadi-Camara, who had committed the seatbelt violation, but also from Mr. Soro. The Tenth Circuit has implied that law enforcement officers may require special justification to request identification from passengers, as in a case where the driver fails to produce a valid driver's license. See, e.g., *Zubia-Melendez*, 263 F.3d at 1161 ("Once it was established that [the driver] could not provide evidence of his identity or authority to drive the vehicle, [the officer] was justified in requesting identifying information from [the passenger].")

However, as the Court noted above, Officer Garcia may well have had reasonable suspicion, even before checking the Defendants' identifications, that the Defendants were engaging in criminal activity independent of the seat belt violation. In that case, Officer Garcia's investigation could properly exceed the scope required to issue a citation for a traffic violation. In addition, even if reasonable suspicion had not developed until the Defendants' identifications had been examined, and if requesting identification from Mr. Soro thus rose to the level of a Fourth

11

Amendment violation, this violation would not have tainted the remainder of the investigation. For example, Officer Garcia acted properly in requesting Mr. Doumbia's driver's license, and upon examining it, could conclude that the name on the license failed to match the name on either of the passports presented at the motel. As the Court will discuss in greater detail below, once probable cause had developed as to one Defendant, this probable cause would have extended to that Defendant's traveling companions, under the circumstances.

The Government contends that the Defendants' use of different identifications at the motel and during the I-25 stop supported not only reasonable suspicion, but probable cause as well. Specifically, the Government argues that if the passports presented at the motel "were altered or fraudulently misused, that would be a violation of various laws, including but not limited to 18 U.S.C. 1001,1543, and 1546." If the identifications shown to Officer Garcia "were altered or being fraudulently misused, that would be a violation of various laws, including but not limited to 18 U.S.C. 1001 and 1028."

The Tenth Circuit has stated that "'[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995), quoting *Jones v. City and County of Denver*, 854 F.2d 1206, 1210. This Court finds that by the time that the I-25 stop concluded, Agent Midkiff and Agent McCullough had acquired probable cause to arrest the Defendants for violating 18 U.S.C. § 1028. Section 1028 concerns "fraud and related activity in connection with identification documents and information." Among its provisions is § 1028(a)(4), which prohibits the knowing possession of "an identification document (other than one issued

lawfully for use of the possessor) or a false identification document, with the intent such document be used to defraud the United States."

In this case, a prudent person could conclude, based on the information the agents had gathered, that at least one of the Defendants possessed an ID "other than one issued lawfully for use of the possessor." By process of elimination, the agents knew that at least one of the men who had gone inside the motel possessed identification documents in more than one name. They knew that the Defendants had received mail from a federal agency addressed to Ali Hussain and Shakeel Aftaben. The agents had a firm basis for believing that, of the identification documents in the Defendants' possession, the Aftaben and Hussain passports were not *bona fide* IDs. First, two of the Defendants had used the passports to engage in somewhat unusual conduct– receiving correspondence from a government agency, the Social Security Administration, at a motel at which they had never stayed. Second, the failure of any of the Defendants to produce the Aftaben and Hussain passports when Officer Garcia asked whether they had any passports in the car suggested that the Defendants were trying to conceal what may have been false documents.

In addition, in light of the facts known to the agents, a prudent person might deduce that the Defendants possessed the Aftaben and Hussain passports "with the intent such document[s] be used to defraud the United States." The agents could reasonably infer that at least one of the men had used a false document in conducting some transaction with the Social Security Administration. They knew not only that two of the Defendants had received letters from the Social Security Administration in the names of Aftaben and Hussain, but also that the Defendants' activities bore some resemblance to those of a group of men, of a similar general description, who had been traveling around the Southwest and allegedly perpetrating Social Security fraud in

13

Oklahoma.

The above analysis demonstrates that there was clearly probable cause to arrest at least one of the three Defendants. The question remains, however, whether the circumstances supporting probable cause as to one Defendant extended to the other two Defendants. The United States Supreme Court has stressed that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

In *Ybarra*, police acting on a tip that a bartender at a tavern was dealing drugs obtained a warrant to search the tavern for evidence of the crime. During the search, an officer frisked Mr. Ybarra, a bar patron, and found heroin in one of his pockets. The Supreme Court ruled that Mr. Ybarra's Fourth Amendment rights had been violated, because the state had not established that the police had any reason to believe that just because Mr. Ybarra was a customer at the bar, he was involved in criminal conduct. Id. at 90-91. The *Ybarra* court stated that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. at 91.

The circumstances of this case differ significantly from the circumstances in *Ybarra*. Here, probable cause as to the other two Defendants would not be based on their "mere propinquity to others independently suspected of criminal activity." Rather, the FBI agents and Officer Garcia had gathered a great deal of information that the Defendants were working as a group to execute the suspected fraud scheme. At least two men initially rented the Silver Saddle Motel room, about two weeks before July 20. All three Defendants visited the motel on July 20 to ask whether any mail had arrived for Hussain and Aftaben. Two of the Defendants entered the motel the next

14

day, to pick up the mail. In addition, the tip from Oklahoma indicated that a *group* of African men were engaging in Social Security fraud. Finally, it seems far more reasonable to infer that a person riding around in a car with a person committing a crime is involved in the criminal activity of his companion, than it is to infer that a customer at a bar is involved in the criminal activity perpetrated by the bartender.

III. THE McDONALD'S PARKING LOT DETENTION

The Court's conclusion that probable cause developed during the I-25 stop renders extensive discussion of the Defendants' arguments concerning the McDonald's stop unnecessary. Defendants have contended that Agent Midkiff and Agent McCullough violated their Fourth Amendment rights by detaining them in the McDonald's parking lot and by conducting a search of the Camry and the suitcases. However, once probable cause to arrest had been established, the agents could properly detain the Defendants, even if that detention constituted a full-scale arrest from its inception. After all, "[a] warrantless arrest in public with probable cause does not violate the Fourth Amendment, even though exigent circumstances do not exist." *United States v. Maez*, 872 F.2d 1444, 1449 n.7 (10th Cir. 1989), citing *United States v. Watson*, 423 U.S. 411, 423-24 (1976). At the end of the I-25 stop, the agents had probable cause to arrest the Defendants. The agents received no information in between the I-25 stop and the McDonald's stop which would have extinguished this probable case. Therefore, this Court finds that the agents' eventual seizure of the Defendants at McDonald's was lawful.

The Defendants have also argued that the agents acted improperly in searching the Camry and the suitcases found in the Camry's trunk. Although the parties have offered conflicting testimony on whether the agents had received consent before searching the car and luggage, this

15

Court need not decide whether the agents had consent to search. The Court finds that the agents had probable cause on which to base the search. The Tenth Circuit has stated:

> Under the Fourth Amendment, the police may conduct a warrantless search where they have probable cause to search the area in question and exigent circumstances exist to make the warrant requirement impractical. *See Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In the context of vehicle searches, a warrantless search is permissible if there is probable cause to believe that the vehicle contains contraband. *See California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Crabb*, 952 F.2d 1245, 1246 (10th Cir. 1991). In addition, if there is probable cause to search a vehicle, the police are allowed to search any package within the vehicle that is capable of concealing the object of the search. *See Wyoming v. Houghton*, 526 U.S. 295, 307, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

*United States v. Edwards*, 242 F.3d 928, 939 (10th Cir. 2001). The *Edwards* court went on to note that that "[p]robable cause to search a vehicle is established if, under the 'totality of the circumstances[,]' there is a 'fair probability' that the car contains contraband or evidence." Id., quoting *United States v. Nielson*, 9 F.3d 1487, 1489-90 (10th Cir. 1993).

Here, the circumstances clearly suggested that there was at least a fair probability that the Camry and the suitcases contained evidence of the Defendants' suspected efforts to use false identifications to defraud the United States. For example, when the Silver Saddle Motel clerk asked the Defendants for identification, the Defendants had apparently retrieved passports from the trunk of their car. Likewise, in response to Officer Garcia's request to see any passports that the Defendants had, Mr. Doumbia opened the trunk to find the Souleymane Cisse passport. In addition, the Defendants were using a car rented in Arizona to drive around New Mexico, and they thus appeared to be traveling. There were no indications that the Defendants had other than a transitory relationship with the state of New Mexico. The agents hence had good reason to believe that evidence of the Defendants' activities would be found within the car, as opposed to in

their homes.

IT IS THEREFORE ORDERED that the Defendants' Motion to Suppress (Doc. No. 16) is denied as to the physical evidence challenged by the Defendants.

_____
CHIEF UNITED STATES DISTRICT JUDGE